Fred F. Fischer v. Commissioner.
Fischer v. Commissioner
Docket No. 8737.
United States Tax Court
1947 Tax Ct. Memo LEXIS 212; 6 T.C.M. (CCH) 520; T.C.M. (RIA) 47131; May 8, 1947
*212 Held, the purchase and retirement by a corporation of all the shares of its stock held by one of its stockholders did not, under the circumstances here present, amount to the distribution of a taxable dividend to its remaining stockholders. Held, further, petitioner, the president of the corporation, is not entitled to deduction in his individual return of amounts claimed to have been spent for entertainment and sales promotion for the purpose of obtaining business for the corporation. Gilbert Weiss, Esq., 1724 Arcade Bldg., St. Louis, Mo., for the petitioner. Lester M. Ponder, Esq., for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion The petitioner here seeks a redetermination of deficiencies in income taxes for the calendar years 1939 and 1941 in the respective amounts of $2,616.09 and $2,182.74. Two questions are presented: first, whether the purchase and retirement by Fischer Meat Company of 250 shares of its stock held by another resulted in the distribution of a taxable dividend to the petitioner in 1939; second, whether petitioner is entitled to deductions for 1939 and 1941 of amounts claimed as entertainment and sales promotion expenses. Findings of Fact Petitioner is a resident of St. Louis, Missouri, and his income tax returns for the years involved were filed with the collector of internal revenue for the first district of Missouri. Petitioner is the president of Fischer Meat Company, a Missouri corporation organized in 1900 as successor to Fischer Packing Company established in 1895 by the petitioner's *214 father, Otto F. Fischer. It is engaged in the meat provision business, selling to hotels, restaurants, clubs, cafeterias and markets in and around St. Louis. Petitioner has been connected with the business for many years and since 1935 has been the acting head or managing officer. After 1935 Otto F. Fischer devoted his time to the business in an advisory capacity until his death. On August 4, 1938, Otto F. Fischer died, testate, survived by his widow, Mary C. Fischer, his son, the petitioner, and his two daughters, Helen Irene Rhodes and Gertrude Boerger. At the time of his death the authorized and outstanding capital stock of Fischer Meat Company consisted of 2,250 shares of common stock of the par value of $100 a share, of which Otto held 1,350 shares, petitioner and Mary C. Fischer each held 300 shares, and Helen Rhodes and Helen Marie DeDonato (the daughter of Gertrude Boerger) each held 150 shares. The will of Otto Fischer bequeathed his 1,350 shares as follows: Petitioner 1,000 shares, Mary C. Fischer 150 shares, Gertrude Boerger and Helen Irene Rhodes each 100 shares. The will further provided for money bequests of $5,000 each to three grandchildren of the testator and, *215 after a few minor specific bequests, the residue of the testator's estate was bequeathed to petitioner and the St. Louis Union Trust Company to hold in trust as co-trustees. The trustees were directed to hold one-half of the residue in trust for the benefit of the widow, Mary C. Fischer, for life, with one-third of the remainder to the petitioner or his descendants and the other two-thirds of the remainder to be added to trusts established for Helen Rhodes and Gertrude Boerger. Of the other half of the residue, the trustees were to pay over and deliver 7/15ths to petitioner free from trust and to hold the remaining 8/15ths in trust in equal shares for Helen Rhodes and Gertrude Boerger, and upon the death of Helen Rhodes, to hold one-half of the property then constituting her share in trust for the benefit of her husband, Hugh D. Rhodes. The remainder of Gertrude Boerger's share was to go to her descendants, and one-half the remainder in Helen's share at her death and the remainder in the other half of her share at her husband's death were to go to the descendants of petitioner. Petitioner and the St. Louis Union Trust Company were appointed and served as co-executors of the estate *216 of Otto Fischer. Petitioner's sister, Mrs. Rhodes, from 1935 to the date of Otto's death objected to petitioner's management of the meat company and to his borrowing money from the company on unsecured notes. As of April 30, 1939, petitioner owed the company a total of $16,000 on unsecured demand notes given in the period from June 16, 1938, to April 24, 1939. The meat company derived a profit of $625.41 from its meat operations and a profit of $2,380.90 from its operations as a whole during its fiscal year ended April 30, 1938. In its fiscal year ended April 30, 1939, the company sustained a loss of $5,179.95 from its meat operations and realized a profit of $2,506.13 from its operations as a whole. As of April 30, 1938, the capital and surplus accounts of the meat company reflected the respective amounts of $225,000 and $44,935.05. Insurance amounting to $64,394.40 was paid to the company as proceeds of policies upon the life of Otto Fischer and the proceeds were credited to surplus. As of April 30, 1939, the capital and surplus accounts reflected the respective amounts of $225,000 and $121,835.58. After Otto Fischer's death Mrs. Rhodes was also dissatisfied with the inheritance *217 her father had left her and she engaged counsel to represent her. Petitioner likewise engaged counsel to represent him and the meat company. Mrs. Rhodes and her counsel threatened to institute receivership proceedings against the meat company and to file suit contesting the will and the validity of the trusts provided for therein. On June 19, 1939, Mrs. Rhodes' counsel wrote to petitioner's counsel as follows: "Mrs. Rhodes is very pronounced in her conviction that the corporation, Fischer Meat Company, is not being successfully handled by the present management, and that in view of the earnings since the death of her father, the expenses and the salaries have been out of proportion and some changes in the management of the business should be brought about so that this corporation, which has been a great money maker, shall continue to pay at least ordinary dividends." Mrs. Rhodes was demanding $275 a share for her stock in the meat company and $130,000 to $140,000 to settle the will controversy, apart from claims arising from the stock. Offers to settle on that basis were made to petitioner's counsel by her counsel and refused. Mrs. Rhodes and her husband had a loan in the amount *218 of $15,000 at the Mississippi Valley Trust Company, to secure which, Otto F. Fischer had during his lifetime pledged 100 shares of his DuPont stock. When the controversy with Mrs. Rhodes arose the DuPont stock was still pledged to the bank, and the executors wished to obtain its release as an asset of the estate. Petitioner authorized his counsel to offer $10,000 to settle the will controversy, which was refused by Mrs. Rhodes' attorney. At the request of his mother and older sister, Mrs. Boerger, petitioner later raised the offer to $15,000 to settle the will contest and obtain the release of the DuPont stock. Finally, the amount was raised to $15,250. The book value of the meat company stock at the close of the fiscal year ended April 30, 1939, was about $155 a share. The final amount of settlement of all claims in dispute was determined on the basis of $15,250 for settlement of the will contest and release of the DuPont stock, plus $175 per share for the 250 shares of Mrs. Rhodes' stock, or $43,750 - a total of $59,000. Accordingly, on July 20, 1939, petitioner and Mr. and Mrs. Rhodes executed a written agreement settling their disputes. That agreement, after reciting the *219 death of Otto Fischer, testate, and the fact that petitioner and Mr. and Mrs. Rhodes were legatees, reads in part as follow: "(c) WHEREAS, a claim has been asserted and a controversy has arisen between Helen Irene Rhodes and Frederick Francis Fischer as to the validity of said will and the amount she is entitled to receive as an heir or legatee of her father in his estate, and Frederick Francis Fischer denies that she is entitled to receive as much as she claims, and denies her claim that said will is invalid, and as a result of said disagreement, controversy and dispute, the said Helen Irene Rhodes, for the purpose of establishing her claims, is about to file such suit or suits as might be necessary to test the validity or meaning of said will and to construe and test the validity of the trusts created thereunder, and Frederick Francis Fischer and the other legatees desire to avoid the filing of such suit or suits. "(d) THEREFORE, in order to comprise and settle said disputes and differences and to avoid litigation and to enable the executors and trustees named in said will to carry out said will in accordance with its true tenor and effect, said Helen Irene Rhodes and Hugh D. *220 Rhodes, her husband, and said Frederick Francis Fischer have made the following compromise and settlement and entered into the following agreement: "(1) Said Frederick Francis Fischer will purchase or secure a third party to purchase from Helen Irene Rhodes the One Hundred (100) shares of stock of the Fischer Meat Company bequeathed to her by the third paragraph of the will of Otto Frederick Fischer and he will also purchase or secure a third party to purchase from her One Hundred Fifty (150) shares of the capital stock of said meat company which she owned in her own right prior to and at the death of Otto Frederick Fischer, and in payment for said shares and as consideration for the settlement and compromise of the claims in dispute, and in particular, the recognition of the validity of the said will and the validity of the said trusts created thereunder, said Frederick Francis Fischer in his own behalf and on behalf of all the other legatees in the will of the said Otto Frederick Fischer, will pay to Helen Irene Rhodes the sum of Fifty-Nine Thousand Dollars. "(2) It is understood that all or any part of the money arising from the sale of said Two Hundred Fifty (250) shares of *221 stock may be used to apply on the Fifty-Nine Thousand Dollars ($59,000.00) to be paid by Frederick Francis Fischer to Helen Irene Rhodes, as stated above, and such sum as may be allocated or paid on said consideration of Fifty-Nine Thousand Dollars ($59,000.00) shall be determined by Frederick Francis Fischer, but the amount arising from the sale of stock so allocated, paid or applied to the obligation of Fifty-Nine Thousand Dollars ($59,000.00) shall not be construed as adequate or inadequate as reflecting the real or actual value of said Two Hundred Fifty (250) shares, but the value of said stock shall not be affected by the amount allocated, but the amount so allocated and applied shall be received by the said Helen Irene Rhodes as full and complete payment for the said stock, and she releases and relinquishes all right, title and interest, both legal and equitable that she may have by reason of ownership of said stock and this stipulation may be set up as a bar forever in any suit, legal or equitable, affecting any claim or claims of any nature whatsoever in or over said stock, and when the full sum of Fifty-Nine Thousand Dollars ($59,000.00) shall be paid (including the amount *222 allocated and paid to Helen Irene Rhodes arising from the sale of the said Two Hundred Fifty shares of stock), the entire consideration of this contract shall be deemed paid in full. * * *
"(5) For the considerations above stated, Helen Irene Rhodes and her husband, Hugh D. Rhodes, agree not to bring any suit to contest the said last will and testament of the said Otto Frederick Fischer or to have the said will or trusts declared invalid by any court. * * *
"(7) It is further agreed between said parties that whereas the said Hugh D. Rhodes has a certain note at the Mississippi Valley Trust Company, which is secured in part by One Hundred (100) shares of DuPont Common Stock, which is the property of the estate of the said Otto Frederick Fischer, he will concurrently with the payment of the money aforesaid, make arrangements for the release of the said One Hundred (100) shares of DuPont stock and turn the same over to the Executors of the Estate of Otto Frederick Fischer. "(8) It being the intention of all the parties hereto to determine fully all matters in dispute and recognize all the right, title and interest of each and everyone a party hereto, each of said parties *223 does by these presents bind his or her heirs, administrators, executors and assigns, and it is further agreed that this stipulation shall be executed in triplicate and each copy thereof be an original." * * *
The agreement further provided that Mr. and Mrs. Rhodes' interests in the testamentary trusts should not be affected and that said trusts should be carried out in accord with the provisions of the will. Immediately after the execution of the agreement, Mrs. Rhodes endorsed in blank and turned over to petitioner's counsel the certificate which she held in her own right for 150 shares of the company's stock. At the same time she executed and delivered to petitioner's counsel an assignment to petitioner of the certificate for the 100 shares bequeathed to her under her father's will. Petitioner did not have the money to pay for these shares of stock. On the same day, July 20, 1939, a special meeting of the board of directors of Fischer Meat Company was held pursuant to waiver of notice. Petitioner and one A. H. Schmidt were then the only directors of the company. One share of stock owned by petitioner had been issued to Schmidt to qualify him as a director. At the meeting *224 it was unanimously agreed that the company purchase Mrs. Rhodes' 250 shares of stock at $175 a share, the stock to be retired and the surplus account charged with the excess of $75 per share over the par value. On July 21, 1939, a special stockholders' meeting was held pursuant to waiver of notice signed by all the stockholders of record, including Mrs. Rhodes. All the stockholders except Mrs. Rhodes attended. The minutes of the meeting read in part as follows: "Mr. Frederick Francis Fischer offered and moved the adoption of the following resolution, to-wit: Whereas, the Board of Directors of the Fischer Meat Co. have heretofore compromised and settled all claims and controversies between Helen Irene Rhodes and the Fischer Meat Co. and have caused to be purchased her stock at the price of One Hundred Seventy-five Dollars ($175.00) per share and have paid the same from the surplus account and the 150 shares of stock owned by the said Helen Irene Rhodes have been surrendered and cancelled and the 100 shares bequeathed to her by her father, now held by the executors and trustees of his estate have been assigned to Frederick Francis Fischer as agent for the Company to be surrendered *225 to said Company as soon as they are distributed by order of the Probate Court through the said executors and the price paid for said stock includes all claims of any nature whatsoever that the said Helen Irene Rhodes has, had or might have against the Company and is a complete discharge and settlement of the same; Now, be it resolved, that the action of the Board of Directors and President of the Fischer Meat Co. be affirmed and ratified in all particulars as to the settlement of said claim of said Helen Irene Rhodes and the purchase and cancellation of said stock, and said President is empowered and authorized to do any and all things necessary to further effectuate and carry out this settlement and compromise." The stockholders present unanimously adopted the resolution and approved the action of the directors. On July 20, 1939, Mrs. Rhodes received a check of the Fischer Meat Company in the amount of $26,250 and on the next day a second payment was made to her by the company in the amount of $17,500 and she thereupon executed the following receipt: "Received from Fischer Meat Company and Frederick Francis Fischer the sum of Forty-Three Thousand Seven Hundred Fifty Dollars *226 ($43,750.00), to be credited as part payment on contract dated July 20, 1939, between Helen Irene Rhodes and Frederick Francis Fischer and others; and in consideration of the payment so made, I, the undersigned, Helen Irene Rhodes, hereby release the Fischer Meat Company from any and all claims that have accrued or may accrue in relation to the ownership by me of two hundred fifty (250) shares of stock of said company and the management and conduct of said business." These payments, aggregating $43,750, were a part of the $59,000 settlement agreed to in the contract above set out. The balance of $15,250 was paid to Mrs. Rhodes by petitioner personally in November 1939. The Probate Court having jurisdiction of Otto's estate allowed counsel representing the executors a fee of $3,000 for services in the estate matter for settling the will controversy. The stock purchased from Mrs. Rhodes was retired, and the capital and surplus accounts of the meat company were reduced proportionately. The certificate for the 150 shares which she owned outright was turned over by petitioner to the company after the payments were made by it to Mrs. Rhodes. Petitioner did not receive the certificate *227 for the 100 shares bequeathed to her until February 4, 1941, after the closing of the estate of Otto Fischer. This certificate was likewise turned over by petitioner to the meat company. Both certificates were cancelled. On January 18, 1941, petitioner received 1,000 shares of the meat company stock as a bequest in the final settlement of Otto Fischer's estate. Upon the distribution of the Fischer estate under order of the Probate Court on January 18, 1941, the stock of the meat company was held of record as follows: Petitioner
1,299 shares
Mary C. Fischer
450 shares
Gertrude Boerger
100 shares
Helen Marie (DeDonato) Bruce
150 shares
August Schmidt
1 share
The 1,350 shares of meat company stock owned by Otto Fischer at the time of his death were valued for Federal estate tax purposes at $81 a share. The Commissioner determined that the Fischer Meat Company stock had a fair market value of $86.50 per share on July 20, 1939. He then determined that of the $43,750 paid by the company for the purchase of Mrs. Rhodes' 250 shares, only $21,625 represented the fair market value of such stock. He has held that the excess of $22,125 was a payment for the benefit *228 of the remaining stockholders and taxable to them as a dividend. The benefit per share he calculated to be $11.0625 on the basis of 2,000 outstanding shares, and he determined that the dividend received by petitioner on the basis of 1,300 shares was $14,381.25. Petitioner received a salary from the Fischer Meat Company for his services as president during the years 1939 and 1941 in the respective amounts of $9,360 and $9,420. In his return for 1939, he claimed deduction for "sales promotion expenses" in the amount of $3,823.50 and in his return for 1941, he claimed a deduction of $4,490.10 for "expense of entertaining customers and promoting increased sales." Respondent disallowed both deductions. Prior to 1939, entertainment expenses were charged to the meat company. After complaint by Mrs. Rhodes, petitioner took such expenses upon himself personally. In 1939 and 1941, petitioner kept diaries in which he recorded his daily expenditures for such items as luncheons, dinners, cigars, drinks, baseball games, entertainment, etc. Petitioner did considerable entertaining for the purpose of building up good will for the Fischer Meat Company and promoting its business. Opinion ARUNDELL, *229 Judge: As to the first issue, respondent's position is that the Fischer Meat Company in purchasing Mrs. Rhodes' stock disbursed its money to her at the instance of petitioner in his interest and in the interest of the other remaining stockholders; that the price paid was in excess of the fair market value of the stock; and that the excess amounts to a constructive dividend, a pro rata part of which is taxable to petitioner. Undoubtedly there are instances where stockholders may be held taxable on dividends even though the formalities of a dividend declaration are not observed, although the distribution is not recorded on the corporate books as such, or even if the distribution is not in proportion to stockholdings. For example, if a corporation cancels a debt owing to it by a stockholder, see ; , aff'd., , or disburses its earnings to satisfy a personal debt or obligation of a stockholder, , or for some other purpose purely personal to the stockholder, ; , *230 the result may well be equivalent to the receipt of a taxable dividend by the stockholder. Respondent relies on such cases as these. On this record we cannot agree that the meat company in purchasing Mrs. Rhodes' stock was satisfying a purely personal obligation of the petitioner or the other stockholders and serving no purpose of its own. The undisputed evidence shows that several matters were in controversy. Mrs. Rhodes personally and through her counsel was complaining of the management and operation of the business of the meat company, of its meager earnings and failure to pay dividends, whereas in the past it had been a great money maker. She threatened to institute receivership proceedings against the company, and she was demanding $275 a share for her stock at a time when the book value was only about $155 a share. It is true that Mrs. Rhodes, in addition to her claims with respect to the stock, was dissatisfied with her inheritance under her father's will and threatened to contest it. She was demanding $130,000 to $140,000 to settle that claim, but petitioner authorized his attorney to offer only $10,000 in settlement of the will contest matter. Later it developed that *231 100 shares of DuPont stock, an asset of the estate, were pledged to secure a bank debt of Mr. and Mrs. Rhodes in the amount of $15,000; and the executors were anxious to secure the release of the DuPont stock. At his mother's and older sister's request, petitioner raised his offer to $15,000 to settle the will contest and obtain release of the DuPont stock. He finally paid an amount of $15,250 personally in this connection. The total figure of $59,000 finally agreed upon and set out in the written compromise agreement was in settlement of all the claims and matters in dispute. Settlement was effected on the basis of the purchase of Mrs. Rhodes' meat company stock at $175 a share, or $43,750, plus $15,250, to be paid by petitioner in connection with the will dispute, making up the total of $59,000. It is apparent from the written agreement that the purchase of Mrs. Rhodes' stock in the meat company was a matter of first consideration. Petitioner was to "purchase or secure a third party to purchase" the stock, and the purchase price was to be credited against the $59,000. By the sale of her stock Mrs. Rhodes released and relinquished "all right, title and interest, both legal and equitable, *232 that she [might] have by reason of ownership of said stock" and it was provided that the settlement agreement might "be set up as a bar forever in any suit, legal or equitable, affecting any claim or claims of any nature whatsoever in or over said stock." (Italics supplied.) Mr. Rhodes further agreed to arrange for the release of the 100 shares of DuPont stock from pledge and turn it over to the executors of the estate. The corporate records and minutes show that in arranging for the purchase of Mrs. Rhodes' stock petitioner was acting as agent for the meat company to compromise and settle all claims she had against the company. In giving receipt for the payment of $43,750, received by Mrs. Rhodes from the meat company for her stock, she released the company "from any and all claims that have accrued or may accrue in relation to the ownership by [her] of the Two Hundred Fifty (250) shares of stock of said company and the management and conduct of said business." Thus, the evidence of record here refutes the respondent's contention that a will contest was the only or even the primary matter sought to be settled in the compromise agreement. Furthermore, there is no foundation *233 for an assumption that a corporation would never, in its own interests, pay more than the fair market value of its stock in order to rid itself of a complaining minority stockholder threatening to institute receivership proceedings against it. Respondent argues that any complaint Mrs. Rhodes may have had with respect to the meat company was against the manner in which petitioner was personally operating the business, and hence the matter was of no direct corporate concern but was in the nature of a personal claim against petitioner as an officer of the corporation. However, under Missouri law mismanagement is one of the grounds for which a minority stockholder may sue to have a receiver appointed to take charge of the business, property, and effects of the corporation. Mo. R.S.A. (1939) §§ 5366-5368; ; . Under such circumstances, it cannot be said that the meat company had no purpose of its own to serve in avoiding a threatened receivership. Regardless of whether Mrs. Rhodes' complaints were justified, they had a nuisance value sufficient to warrant *234 the action of the corporation in purchasing her stock. In the light of the $275 a share which Mrs. Rhodes was demanding, we think the price of $175 finally paid, a price only about $20 more than the then book value of the stock, was not unreasonable for the purpose of promoting harmony in the conduct of the business and securing it from annoying interference and threats of legal proceedings. If any advantage can be said to have accrued to petitioner from the corporation's purchase of Mrs. Rhodes' stock, we do not think it is of a kind which would justify a holding that any part of the purchase price amounted to a constructive dividend to him. In reaching this conclusion we have not overlooked a Memorandum Opinion of this Court in the case of Helen Irene Rhodes, Docket No. 1709, entered September 16, 1944 [, involving the 1939 income tax liability of petitioner's sister, Mrs. Rhodes, growing out of the same transaction as that involved here, and in which we arrived at a different result. Respondent's position in that case was similar to the position of the petitioner in this case. But the records in the two cases are different. The testimony on which our conclusion *235 was so largely based in the Rhodes case is not present in the instant record, and at least some of the testimony on which we rely here was not successfully introduced in the prior proceedings. We must of necessity decide the instant controversy on the record now before us. The present petitioner may not be bound by testimony in another proceeding produced by parties whose interests were adverse to his. Here the respondent made little, if any, attempt to contradict or impeach petitioner's evidence. The second issue involves the deductibility of so-called entertainment and sales promotion expenses claimed by petitioner in 1939 and 1941. The evidence on this issue is meager and unsatisfactory. The sums claimed amount to about 40 or 45 per cent of the petitioner's salary as president of the company in the respective years. Aside from the fact that some of the items disclosed in the evidence would seem to be of a personal nature, it appears that any of the expenses which may reasonably be characterized as genuine business expenses were expenses pertaining to the corporation's business. Petitioner testified in a general way that the expenditures were made for the purpose of promoting business *236 for the company and building up the good will of the company. One taxpayer, of course, may not take deductions properly belonging to another. ; see also, . It is alleged in the petition, and denied in the answer, that petitioner was obligated by the nature of his position to entertain for business reasons and for the promotion of the corporate enterprise, and that these matters were taken into consideration by the board of directors of the corporation in fixing the amount of petitioner's salary. If such were the case, the result might well be different. But the evidence adduced fails to prove the fact alleged. We conclude therefore, that petitioner is not entitled to the deductions claimed. Decision will be entered under Rule 50.