JOSEPH P. SCHMITT AND RUTH B. SCHMITT, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

JAMES S. LEHREN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 38971, 38972.   Promulgated May 14, 1953.

*Norman D. Keller, Esq.,* for the petitioners.
*Roy E. Graham, Esq.,* for the respondent.

OPINION.

LeMire, *Judge:* The respondent determined that the petitioners, in the taxable year 1947, received a taxable distribution equal to the fair market value of 1,486 shares of the capital stock of Wolverine.

Petitioners contend that the distribution of such shares was a nontaxable stock dividend within the ambit of *Eisner* v. *Macomber*, 252 U. S. 189, and our decisions in the cases of *James Kay*, 28 B. T. A. 331, and *David Bruckheimer*, 46 B. T. A. 234.

The authorized capital of Wolverine was 2,500 shares of common stock of the par value of $50 per share, and 2,063 shares had been issued. Prior to September 16, 1937, the corporation had reacquired by purchase 210 shares, which were held in its treasury. Of the remaining 1,853 shares, Dora Elliott Green held 1,486 shares, Joseph P. Schmitt 168 shares, and James S. Lehren 199 shares. From 1937 to 1945, Wolverine paid to Dora Elliott Green sums totaling $432,292.12 to acquire her 1,486 shares. The 210 shares previously purchased and the 1,486 shares acquired from Dora Elliott Green were not retired, but were carried on Wolverine's balance sheets as assets.

On June 13, 1947, Wolverine's board of directors adopted a resolution in substance as follows:

WHEREAS, there is now in the Treasury of the company, 1,486 shares of its capital stock which was acquired by purchase from Dora Elliott Green, and represents undivided profits invested in said security and,

WHEREAS, it is deemed advisable to divide said stock as a dividend among the stockholders of record at the close of business, July 1, 1947, be it therefore

RESOLVED: that the President and the Secretary be and they hereby are authorized and directed to distribute the said 1,486 shares of the capital stock of this company now held in the Treasury of the company to the stockholders of record at the close of business July 1, 1947, in proporation [*sic*] to their holdings as of said date.

This record discloses that during the period 1937 to 1947, inclusive, the balance sheets of Wolverine stated its capital stock liability to be $103,150, representing the 2,063 shares it had previously issued at the par value of $50 per share. As of December 31, 1946, the 1,486 shares acquired from Dora Elliott Green under the contract of September 16, 1937, plus the 210 shares repurchased by the corporation during the period when petitioners were attempting to acquire the shares held by Dora Elliott Green, were carried as corporate assets at cost. At the time of the distribution there was no conversion of surplus into capital stock.

In *Bass* v. *Commissioner*, 129 F. 2d 300, in discussing a true stock dividend, the United States Court of Appeals for the First Circuit said:

"A stock dividend always involves a transfer of surplus (or profit) to capital stock." Graham and Katz, Accounting in Law Practice, 2d ed. 1938, § 80. As the court said in *United States* v. *Siegel*, 8 Cir., 1931, 52 F. 2d 63, 65, 78 A. L. R. 672: "A stock dividend is a conversion of surplus or undivided profits into capital stock, which is distributed to stockholders in lieu of a cash dividend." Congress itself has defined the term "dividend" in § 115 (a) of the Act as meaning any *distribution* made by a corporation to its shareholders, whether in money or in other property, *out of its earnings or profits.* In *Eisner* v. *Macomber*, 1920, 252 U. S. 189, 40 S. Ct. 189, 64 L. Ed. 521, 9 A. L. R. 1570, both the prevailing and the dissenting opinions recognized that within the meaning of the revenue acts the essence of a stock dividend was the segregation out of surplus account of a definite portion of the corporate earnings or profits theretofore available for dividends, the freezing of such segregated earnings as part of the permanent capital resources of the corporation by the device of capitalizing the same, and the issuance to the stockholders of additional shares of stock representing the profits so capitalized. * * *

The respondent argues that the purchase by Wolverine of the holdings of Dora Elliott Green, constituting the majority of the issued and outstanding capital stock, was, in substance, a purchase for the sole benefit of petitioners and served no corporate purpose.

The record establishes that the petitioners were desirous of acquiring the shares held by Dora Elliott Green and made three vain attempts to purchase them, by the application of cash dividends to be declared. However, Dora Elliott Green was also desirous of having the corporation continued by the petitioners, because she was vitally interested in having the corporation maintain its manufacturing plant on her property which the corporation was then occupying under a lease arrangement. Apparently, it was thought that if the majority interest was sold to outsiders they might not continue to occupy her property. This is clearly indicated by the fact that in each of the contracts of purchase entered into by the petitioners and the corporation the execution of a 10- or 12-year lease of the premises was required as part of the consideration. The end result to be achieved was a continuation of the corporation with the petitioners owning the controlling interest.

Other pertinent facts are presented by this record which we think have a bearing on the bona fides of the entire transaction. Prior to the execution of the contract by the corporation to repurchase the shares of Dora Elliott Green, and during the period when the petitioners were endeavoring to purchase such shares, several other stockholders, some of whom were employees, owned small blocks of the capital stock of Wolverine. Since the dividends were to be applied to the purchase price of the Dora Elliott Green shares, it was apparently deemed advisable to eliminate such minor stockholders. The

petitioners were instrumental in having the corporation repurchase the shares of such minor stockholders. Two of the employee stockholders holding 3 and 15 shares, respectively, were reluctant to sell, but were persuaded to do so on the promise of the petitioners to permit them to repurchase the same number of shares at the price they received for them, after the holdings of Dora Elliott Green were acquired. After the corporation had consummated the purchase of the 1,486 shares from Dora Elliott Green, the agreement with the two employee stockholders to resell to them the shares previously purchased by the corporation was not given immediate effect, but was postponed until after the adoption of the resolution in question. On September 14, 1947, a total of 25 shares were sold to the two employee stockholders. If the petitioners had fulfilled their promise to the two employee stockholders, the resolution in question could not have been adopted. The method pursued prevented the two employees from participating in the so-called stock dividend.

We think the resolution distributing the specific shares may not be viewed as an isolated transaction. The effect and final result of the various acts of the parties was a purchase of the shares owned by Dora Elliott Green by the corporation out of its own funds, not with the intention of retaining or retiring them but for the purpose of transferring them to petitioners. This transaction was not completed and there was no taxable distribution to petitioners until the final consummation by the actual transfer of the shares in 1947, which revealed for the first time the real purpose behind the several steps. When viewed in the light of the over-all picture revealed by this record we are convinced that, in substance, the transaction was a distribution of a taxable dividend and not a bona fide stock dividend within the rationale of *Eisner* v. *Macomber, supra,* and kindred authorities. In our opinion, to reach any other conclusion on the facts here presented would permit the tactics employed here to be used as a means of tax evasion where corporate shares are closely held.

We think the cases of *James Kay, supra,* and *David Bruckheimer, supra,* relied upon by the petitioners are clearly distinguishable. The facts and circumstances there involved are not comparable to those presented in the instant case. There the form and substance of the transaction were thought to coincide and the rationale of *Eisner* v. *Macomber, supra,* was held to be controlling.

The respondent determined the petitioners received taxable income in 1947 to the extent of the fair market value of the 1,486 shares at the time of the distribution. The petitioners offered no evidence of the value of such shares and, therefore, the determination of the respondent is sustained.

Reviewed by the Court.

*Decisions will be entered for the respondent.*