MILTON F. PRIESTER AND ROBBIE PRIESTER, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 88419.    Filed May 29, 1962.

*W. Stuart McCloy, Esq.*, for the petitioners.
*Michael P. McLeod, Esq.*, for the respondent.

PIERCE, *Judge:* The respondent determined a deficiency in the income tax of petitioners for the calendar year 1957, in the amount of $75,518.29.

The issues for decision are:

Where a corporation which had only two stockholders, and in which the petitioner held the minority stock interest, purchased or redeemed all the shares of its majority stockholder for a price of $113,000, and then canceled such shares, did this transaction—

(1) Cause petitioner to become chargeable with a constructive distribution of a "dividend" to him of $113,000—being the same amount

which the corporation paid to its majority stockholder in complete redemption of all the latter's shares?

(2) Cause petitioner to become chargeable with constructive receipt of "compensation" of $1,608.33—being the amount which the corporation paid for certain legal, accounting, and interest expenses in connection with its redemption of the shares of its majority stockholder?

All other issues raised by the pleadings have been settled by stipulation of the parties. Effect will be given to such settlements in the computation to be made herein under Rule 50.

FINDINGS OF FACT.

Most of the facts have been stipulated. The written and oral stipulations of facts, and all exhibits identified therein, are incorporated herein by reference.

The petitioners, Milton F. Priester and Robbie Priester, are husband and wife, residing in Memphis, Tennessee. They filed a joint income tax return for the taxable year involved, with the district director of internal revenue at Nashville, Tennessee. Said return was filed in accordance with the cash receipts and disbursements method of accounting.

On about April 1, 1947, petitioner Milton F. Priester (herein called the petitioner) and his older brother, Clift L. Priester, organized a corporation named Priester Machinery Company, Inc., to take over the operation of a business which they had theretofore carried on as partners, of selling and servicing heavy roadbuilding machinery and equipment. The corporation issued in exchange for the assets of the prior partnership, 1,000 shares of common capital stock having no-par value, of which 666 shares were issued to Clift and 334 shares were issued to petitioner. No other or additional shares were thereafter issued. The original officers and directors of the corporation were: Clift, president and treasurer; petitioner, vice president; and James Wingard, secretary. These same three individuals, together with Clift's wife and petitioner's wife, comprised the board of directors. The business was successful.

In October 1948, Clift suffered a cerebral hemorrhage which disabled him; and the responsibility of the business then fell upon petitioner, as vice president. Clift died on February 2, 1950. Thereupon Clift's widow, Marjorie Priester (hereinafter called Marjorie), became the succeeding owner of the 666 shares of the corporation's stock which Clift had owned. She had no prior business experience, but nevertheless she attempted to control the affairs and policies of the business; and this created management and personnel problems within the corporation. In 1951, she caused a new board·of directors

to be installed, consisting of herself, her attorney, E. L. Williamson, and petitioner.  Also at about this same time, the following new officers were elected: Petitioner, president; and Marjorie, vice president, treasurer, and secretary.

On July 1, 1952, petitioner bought from Marjorie, 165 of her shares of stock in the corporation; and these shares were then transferred of record on the corporation's books, and a new stock certificate therefor was issued to and in the name of petitioner.  The price which petitioner paid Marjorie for those shares was $131.80 per share (a total of $21,748.65)—which price reflected the net worth of the stock per books, as of March 31, 1951.  Immediately thereafter, the total issued and outstanding shares of the corporation were owned and held as follows: 501 shares by Marjorie; and 499 shares by petitioner.

About 7 months later, on February 28, 1953, petitioner and Marjorie executed three written agreements (hereinafter called the agreements of February 28, 1953), under which petitioner agreed to purchase from Marjorie all her remaining shares of stock of the corporation, consisting of the above-mentioned 501 shares.[1]  The purchase agreement provided in substance, that petitioner would buy all of Marjorie's said shares at the price of $200 per share (total purchase price of $100,200), payable as follows: $200 in cash, upon execution of the agreement; $30,000 in cash, on or before May 1, 1957; and $35,000 in cash, on or before May 1 of each of the years 1958 and 1959.  Each of said installment payments (other than the first $200 downpayment) was evidenced by a promissory note executed by petitioner and made payable to Marjorie; and each installment was to bear interest at 6 percent per annum.  Also, under the terms of the above-mentioned escrow agreement, all the promissory notes and all of petitioner's and Marjorie's shares of stock were placed in escrow with a local bank; and it was agreed that in the event petitioner defaulted in the payment of any installment, all remaining unpaid installments would become due immediately, and the escrow agent could then sell petitioner's deposited shares, either to Marjorie or to any third party.

During 1956, which was approximately 1 year prior to the due date of the first installment payment under said purchase agreement, petitioner realized that he would be financially unable to meet the same; and he realized also that, if he defaulted in meeting this installment, all the balance of the price would become due immediately, and that all his shares in the corporation would become subject to foreclosure and sale by the escrow agent.  Petitioner thereupon contacted his bank in an

[1] These three written agreements included: (1) A purchase agreement for the above-mentioned shares; (2) an escrow agreement, through which the obligations of the purchase were secured; and (3) a related agreement to the effect that, if Marjorie should elect to have the corporation redeem her said 501 shares covered by the agreement, petitioner would consent to such plan.

attempt to borrow funds with which to pay the oncoming installment; but the bank refused to make him any loan, for the reason that he had practically no assets other than his investment in the corporation, and that all his stock therein had already been pledged under said escrow agreement. Petitioner and his attorney then contacted Marjorie and her attorney, with a view to having her modify the terms of the purchase agreement, or to have her make some arrangement with the corporation for it to redeem her stock; but both Marjorie and her attorney refused to comply with such suggestions. They insisted that the only way in which petitioner might obtain relief from his contractual obligations, would be for her to receive a cashier's check for $100,000, being the full unpaid balance of the purchase price. They said it would make no difference to them, whether such amount was paid by petitioner or by someone else.

In this situation, petitioner began a search for some investor who might be willing to purchase all of Marjorie's interest in the corporation, and thereby eliminate his contractual arrangement with her. In this search for such an investor, he procured the assistance of William Barclay, a certified public accountant who was a local official for one of the national accounting firms which had theretofore made certain audits for the Priester Machinery Company.

Early in February 1957, Barclay contacted a man named Max Pinkerton, who he thought might be interested in buying Marjorie's stock. Pinkerton was prominent in the lumber industry; and Barclay had performed some accounting services for him, but petitioner had never met him. Since about 1946, Pinkerton had been associated with the Pinkerton Lumber Corporation, the North Memphis Lumber Company, and the Gates Lumber Company—all of which carried on operations in the Memphis area. He had been engaged to represent the United States Government in matters relating to the lumber industry in Russia. Also, he had banking connections with two Memphis banks; and he had, on one occasion, obtained a loan of $400,000 from one of these banks.

Pinkerton had confidence in the judgment of Barclay, who acquainted him with the affairs of the Priester Machinery Company and suggested that he might find the purchase of Marjorie's shareholdings to be a good investment. Pinkerton at first demurred; but later, he told Barclay that he would be willing to purchase all of Marjorie's 501 shares for the amount of $100,000 which she was demanding, if he could be assured that after acquiring such stock the corporation would within a period of from 6 months to a year thereafter, purchase or redeem the stock from him at a price of $113,000—so as to enable him to derive a capital gain from the transaction. He further insisted that, since such a purchase would give him only a 51-percent interest in the

corporation, he would have to receive the personal guarantee of petitioner who was the minority stockholder, that such redemption would be effected. Barclay thereupon communicated the terms of such proposal to petitioner, who agreed to the same.

Thereafter, on April 1, 1957, a meeting was held at the main office of the Union Planters National Bank in Memphis, for the purpose of effecting Pinkerton's purchase of Marjorie's 501 shares. The persons there present were: Petitioner and his attorney; Marjorie and her attorney; Pinkerton; Barclay; and one of the officers of said bank. At this meeting, petitioner met Pinkerton for the first time. Thereupon, at said meeting and pursuant to arrangements theretofore made by the attorneys for the parties, the following transactions took place:

1. Pinkerton borrowed from said bank the sum of $100,000, by executing and delivering to the bank his 6-percent promissory note for the same amount, which was made payable to the order of the bank on October 2, 1957. The bank then prepared a cashier's check for $100,000, made payable to the order of Marjorie; but it continued to hold the same pending completion of the other transactions hereinafter mentioned.

2. Petitioner then assigned to Pinkerton, all his rights and interest in the above-mentioned purchase agreement that he had executed with Marjorie on February 28, 1953, under which Marjorie had agreed to sell all her 501 shares of stock in the Priester Machinery Company, and under which agreement there was an unpaid balance on the purchase price of $100,000. Pinkerton thereupon exercised this agreement in accordance with its terms; and caused the above-mentioned $100,000 cashier's check to be delivered to Marjorie, in full payment for all her 501 shares of stock in the corporation.

The fair market value of the stock at that time was $200 per share.

3. At this point, Marjorie executed and delivered to petitioner a written release and discharge from all his obligations under their agreement of February 28, 1953; and she also acknowledged in said instrument, the termination and satisfaction of their above-mentioned purchase agreement. Also, at this time, Marjorie gave written authorization to the escrowee which was holding the shares of both petitioner and herself, to release the same from the escrow.

4. Marjorie thereupon endorsed and delivered to Pinkerton, in consideration for his said payment to her of the $100,000, her certificate for all her above-mentioned 501 shares of capital stock of the Priester Machinery Company. These shares were transferred to Pinkerton on the records of the corporation; and at the same time, a new certificate for 501 shares was issued in the name of Max Pinkerton and delivered to him.

Marjorie then executed her written resignation as an officer and

director of the corporation; and on the same instrument, her attorney likewise executed his resignation as a director—both effective immediately.

Immediately following said events, the issued and outstanding shares of the capital stock of Priester Machinery Company were owned and held as follows: 501 shares by Pinkerton, and 499 shares by petitioner.

5. Pinkerton, as the holder of said 501 shares, then executed and delivered to the Priester Machinery Company a written option, entitling said corporation to buy from him at any time after 6 months and before 1 year from April 1, 1957, all of Pinkerton's said 501 shares of stock at a price of $113,000. Appended to said option was a written guarantee executed by petitioner in favor of Pinkerton, to the effect that the corporation (of which petitioner was the minority stockholder) would exercise said option on October 3, 1957; and petitioner pledged to Pinkerton his own 499 shares of the stock, as collateral security for such guarantee.

6. Pinkerton then delivered to the Union Planters Bank, as collateral security for his above-mentioned $100,000 promissory note, the following: (1) All the issued and outstanding shares of capital stock of the Priester Machinery Company—including both Pinkerton's 501 shares and also the 499 shares of petitioner which had been pledged as collateral security for said guarantee agreement; (2) 20 shares of another stock owned by petitioner; (3) the above-mentioned option granted by Pinkerton to the corporation, entitling the latter to buy his shares, together with the attached guarantee of petitioner that such option would be exercised; and (4) an assignment by Pinkerton to the bank of both said option and said guarantee agreement, together with a power of attorney authorizing the bank to enforce each of these instruments and to receive any amounts which might thereafter become payable under the same.

Shortly after the conclusion of the above transactions, Pinkerton and an attorney named Stuart McCloy were elected as directors of the Priester Machinery Company to succeed Marjorie and her attorney, Williamson, who had resigned, and petitioner continued to serve as the third director. Also at the same time, the following persons were elected as officers: Petitioner, president and treasurer; and Christine Chapman, vice president and secretary.

Thereafter, on April 8, 1957, the board of directors of the Priester Machinery Company adopted a resolution that Pinkerton be notified that the corporation elected to exercise the above-mentioned option to purchase all of Pinkerton's 501 shares of the corporation's capital stock; and that such purchase would be effected on October 3, 1957. Accordingly, on this same date, the corporation sent a letter to Pink-

erton, notifying him of the corporation's intention to exercise said option, and to purchase all his 501 shares of the corporation's stock at the price of $113,000, on October 3, 1957; and it also sent a copy of said letter to the Union Planters Bank.

Subsequently and shortly prior to said date set for exercise of said option, the corporation informed Pinkerton that it would require additional time within which to raise the funds for its purchase of his stock pursuant to the option. Thereupon, Pinkerton and the corporation mutually agreed that the time for closing the purchase should be extended to November 1, 1957; and at the same time, the corporation made a related agreement that it would pay any additional interest on Pinkerton's $100,000 note at the bank, which would accrue as the result of extending the maturity of said note to November 1, 1957.

Thereafter, on October 15, 1957, Priester Machinery Company made arrangements with a bank, under which it borrowed $150,000. The purpose of this loan was to provide the corporation with $113,000 for use in purchasing Pinkerton's 501 shares in accordance with the option agreement; and also to provide it with approximately $37,000 for use in its business operations.

On October 16, 1957, the corporation purchased or redeemed all of Pinkerton's said 501 shares of its capital stock, by paying to Pinkerton the sum of $113,000 pursuant to said option agreement; and thereafter, it canceled all of said shares. Petitioner thereby became the sole remaining stockholder.

Pinkerton used $100,000 of the amount which the corporation so paid him to pay and discharge his above-mentioned bank loan of said amount; and he retained the balance of the corporation's payment for his own use.

The corporation incurred the following expenses in connection with its purchase or redemption of Pinkerton's said stock: $1,375 for attorneys' and accountants' services; and $233.33 paid by it to the Union Planters National Bank pursuant to its above-mentioned arrangement with Pinkerton, to cover additional interest on the latter's $100,000 bank note, which had accrued by reason of the postponement of the closing date for exercising the option.

The corporation, both at the time it paid said amount of $113,000 to Pinkerton and also at the close of its fiscal year involved, had earnings and profits in excess of the amount of said payment.

The respondent, in his notice of deficiency herein, determined: (1) That petitioner was chargeable in the taxable year with a constructive distribution of a "dividend" to him of $113,000—being the amount which the Priester Machinery Company had paid to Pinkerton in purchase or redemption of all the latter's shares of said corporation; and (2) that petitioner also was chargeable in said year

with a constructive receipt of "compensation" from said corporation, in the amount of $1,608.33—being the total of the above-mentioned expenses which the corporation had incurred for attorneys' and accountants' fees and for interest, in connection with its redemption of Pinkerton's shares of stock.

## ULTIMATE FACTS.

None of the $113,000 which the Priester Machinery Company paid to Pinkerton in purchase or redemption of all the latter's 501 shares of stock in the corporation, was distributed to or received either directly or indirectly by petitioner.

Said corporation, at no time during the year 1957, distributed or paid any amount to petitioner in purchase or redemption of any stock or any other equity interest that he had in said corporation; and also, it did not during said year, pay or discharge any indebtedness or any other financial obligation of petitioner.

Pinkerton, in purchasing from Marjorie and selling to the Priester Machinery Company the 501 shares of stock here involved, acted solely on his own behalf, as an investor in such stock; and in none of the above-mentioned transactions was he an agent or representative of any other person.

The above-mentioned expenses which the corporation incurred in connection with its purchase or redemption of Pinkerton's stock, were not incurred at petitioner's request, or on petitioner's behalf, or for petitioner's financial benefit.

## OPINION.

### I.

The first and principal question here presented is whether the payment of $113,000 by the Priester Machinery Company to Max Pinkerton, in purchase or redemption of all the latter's shares of stock in said corporation, caused petitioner to become chargeable with a distribution of a taxable "dividend" to him of the same amount.

In considering this question, we look first to the relevant provisions of the 1954 Code which, so far as here material, are set forth in the margin.[2] It will be observed from these statutory provisions, that

---

[2] SEC. 316. DIVIDEND DEFINED.

  (a) GENERAL RULE.—For purposes of this subtitle, the term "dividend" means any distribution of property made by a corporation to its shareholders—

    (1) out of its earnings and profits accumulated after February 28, 1913, or

    (2) out of its earnings and profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made.

Except as otherwise provided in this subtitle, every distribution is made out of earnings and profits to the extent thereof, and from the most recently accumulated earnings and profits. * * *

section 316(a) defines a "dividend" to be a distribution made by a corporation to its shareholders out of its earnings and profits; and it follows that, unless a distribution that is sought to be taxed to a particular stockholder was either made to him or for his financial benefit, it may not be regarded as either a "dividend" or the legal equivalent of a "dividend" to such stockholder.

1. The respondent's position appears, in substance, to be this. First, he points to the undisputed facts that petitioner had, on February 28, 1953, entered into a stock purchase agreement with Marjorie, under which he obligated himself to buy her 501 shares of stock in the Priester Machinery Company for the price of $100,200; and that this obligation was still in force on April 1, 1957, with petitioner then owing an unpaid balance of $100,000 which he was financially unable to meet and which Marjorie refused to release. Secondly, he advances the legal proposition, which is likewise undisputed, that if the Priester corporation had then employed its earned surplus to discharge said obligation of petitioner to Marjorie, without receiving adequate consideration therefor from petitioner, such action of the corporation would have effected a constructive distribution of a taxable dividend to petitioner, under the principle of *Wall* v. *United States*, 164 F. 2d 462 (C.A. 4). And finally, based on these two undisputed premises, respondent then makes the disputed conclusion that said principle of the *Wall* case is here applicable—because (as he asserts) Pinkerton was merely a "straw man," and also because (as he further asserts) it was the corporation which actually discharged said obligation of petitioner to Marjorie by paying the latter the $100,000 balance of the purchase price of the stock through Pinkerton and the Union Planters Bank as mere intermediaries.

Whether Pinkerton actually was a mere "straw man," and whether it actually was the corporation which discharged petitioner's stock

---

SEC. 317. OTHER DEFINITIONS.

(b) REDEMPTION OF STOCK.—For purposes of this part, stock shall be treated as redeemed by a corporation if the corporation acquires its stock from a shareholder in exchange for property, whether or not the stock so acquired is cancelled, retired, or held as treasury stock.

SEC. 302. DISTRIBUTIONS IN REDEMPTION OF STOCK.

(a) GENERAL RULE.—If a corporation redeems its stock (within the meaning of section 317(b)), and if paragraph (1), (2), (3), or (4) of subsection (b) applies, such redemption shall be treated as a distribution in part or full payment in exchange for the stock.

(b) REDEMPTIONS TREATED AS EXCHANGES.—

(1) REDEMPTIONS NOT EQUIVALENT TO DIVIDENDS.—Subsection (a) shall apply if the redemption is not essentially equivalent to a dividend.

(2) SUBSTANTIALLY DISPROPORTIONATE REDEMPTION OF STOCK.—

(A) In General.—Subsection (a) shall apply if the distribution is substantially disproportionate with respect to the shareholder.

\*    \*    \*    \*    \*    \*    \*

(3) TERMINATION OF SHAREHOLDER'S INTEREST.—Subsection (a) shall apply if the redemption is in complete redemption of all of the stock of the corporation owned by the shareholder.

(4) STOCK ISSUED BY RAILROAD CORPORATIONS IN CERTAIN REORGANIZATIONS.—[Not here relevant.]

purchase obligation to Marjorie, are questions of fact, which must be resolved from a consideration and weighing of all the evidence. After having considered and weighed all the testimony and other evidence, we are convinced that such contentions of the respondent are unsound, in that they are both unsupported by and contrary to the substantive evidence.

We are satisfied on the basis of the evidence, that Pinkerton actually did purchase Marjorie's 501 shares of stock on April 1, 1957, as his own investment; and that in such transaction, he was not acting as a "straw man" for anyone. He was a responsible businessman who had never met petitioner, and who was then associated with three lumber companies in the Memphis area—one of which bore his name; he had banking connections with two Memphis banks, where he had a substantial line of credit; and he had been selected by the United States Government to represent it in matters pertaining to the lumber industry abroad. The suggestion that he might make a profitable investment in the Priester Machinery Company by purchasing Marjorie's shares, came to him from witness Barclay, who was a local official for one of the national accounting firms, and in whose judgment Pinkerton had confidence. Pinkerton testified—and we believe both credibly and convincingly—that he decided to purchase Marjorie's stock at Barclay's suggestion, solely with a view to deriving capital gain therefrom; that he did not however wish to retain such investment for a period of more than 6 months to 1 year; and that, in order that he might be assured of such result, he had demanded and procured a collateralized guarantee from petitioner (the minority stockholder) that if he did purchase such shares, he as the majority stockholder would thereafter be able to have the same redeemed from him by the corporation within said period. The effect of Pinkerton's obtaining such guarantee from petitioner was that, if the corporation did not thereafter redeem the shares from him within the specified period, either because it might not be able to raise the money for such purpose, or because petitioner (as the minority stockholder) might refuse to cooperate with him (the majority stockholder) in authorizing such redemption, then Pinkerton could foreclose on the collateral for said guarantee so as to protect himself from loss, and make himself the sole stockholder of the corporation. We are satisfied that Pinkerton's true intention in entering into the transaction was, as he unequivocally testified, to obtain a short-term investment in the corporation at minimum risk, from which he could reasonably expect to thereafter derive a capital gain.

Moreover, both the testimony and the documentary evidence of record establish that, at the meeting of all the interested parties and their attorneys which was held at the bank on April 1, 1957, Marjorie

actually did sell and transfer to Pinkerton all her 501 shares of stock, in consideration for the cashier's check for $100,000 which Pinkerton at that time obtained through his loan from his bank and delivered to her; that Marjorie thereupon actually did release and discharge petitioner from all his obligations under the above-mentioned stock purchase agreement of February 28, 1953, and also acknowledged in said written release that said agreement was terminated and satisfied; and that Marjorie and her attorney then resigned as directors and officers of the corporation, and thereupon completely terminated all of Marjorie's interest in and connection with the corporation.

The evidence further establishes that all the 501 shares of the corporation which Marjorie had owned prior to said transaction on April 1, were actually transferred to Pinkerton upon the records of the corporation; that Pinkerton, the petitioner, and an attorney named McCloy, then became the new directors of the corporation; and that thereafter until October 16, 1957, when all of said 501 shares were redeemed, Pinkerton personally owned and controlled the majority interest in the corporation.

Moreover, as we have heretofore found as a fact, petitioner did not receive either directly or indirectly, any of the amount which the corporation paid to Pinkerton in redemption of his shares; and since petitioner's prior obligation to Marjorie had theretofore been wholly terminated and discharged on April 1, it follows that such obligation of petitioner was not, and could not have been, discharged by the corporation's subsequent payment to Pinkerton on October 16. Also, since the transactions of April 1 were solely between individuals— that is between Marjorie, Pinkerton, and the petitioner—and since the corporation did not at that time make any distribution to any stockholder, it is obvious that the payment of the $100,000 by Pinkerton to Marjorie, could not possibly qualify as a distribution of a taxable "dividend" to anyone, within the meaning of the above-cited section 316 of the 1954 Code.

2. Notwithstanding our above conclusions, that the petitioner did not receive any of the amount which the corporation paid to Pinkerton in complete redemption of the latter's shares, and that the corporation did not discharge any financial obligation of the petitioner, a question still remains as to whether petitioner may nevertheless be charged with a constructive receipt of a "dividend," by reason of the facts: (1) That petitioner did, during the time that he was the minority stockholder of the corporation, guarantee and vote for the redemption of Pinkerton's shares; and (2) that as the result of such redemption, petitioner was benefited *indirectly*, by becoming the sole remaining stockholder, and possibly by an appreciation in the value of his shares due to such undivided ownership of the company.

A question of similar import was recently considered by the Third Circuit and also by the Ninth Circuit of the Courts of Appeals, respectively; and each of these courts answered such question in the negative. *Niederkrome* v. *Commissioner*, 266 F. 2d 238 (C.A. 9), reversing a Memorandum Opinion of this Court; and *Holsey* v. *Commissioner*, 258 F. 2d 865 (C.A. 3), reversing 28 T.C. 962.

In the *Niederkrome* case, five individuals desired to acquire all the stock of a corporation. Since their available funds were insufficient to enable them to buy more than about half of such stock, they arranged for a sixth person to purchase the remaining shares with borrowed funds which they assisted him to obtain; and the corporation thereafter redeemed all the shares so purchased by said sixth person— with the result that the original five participants became the sole remaining stockholders. This Court, in deciding the case, held that the five remaining stockholders were chargeable with a constructive distribution of a taxable "dividend" to the extent of the amount which the corporation had paid to the sixth individual in redemption of his shares; but, on appeal, the Ninth Circuit not only reversed our decision on procedural grounds, but also indicated that, in its view, there was not a constructive distribution of a "dividend" to anyone. The Ninth Circuit stated in its opinion, in part, as follows:

But these [procedural] errors seem to have deflected the Tax Court from the real question in the case. It seems to have been the rationale of that body that, if it were proved that Bentson [the sixth person] was acting on the suggestion of the other stockholders and not as an independent investor, taxpayers are liable.

\* \* \* \* \* \* \*

The Tax Court addressed itself, on account of the erroneous approach above pointed out, to a hypothetical demonstration of collusion between Bentson and the other stockholders of the purchasing group.

The real question is whether the taxpayers received any financial or economic benefits as a result of the redemption of the stock of Bentson. \* \* \*

It can be argued that taxpayers got full control of the corporation. But should this circumstance, standing alone, be considered an economic or financial advantage? \* \* \*

\* \* \* \* \* \* \*

It is apparently held recently that there must be some real financial or economic value to the remaining stockholders in the redemption of the holdings of another before a tax is due from the former. Holsey v. Commissioner, 3 Cir., 258 F. 2d 865.⁹ Schmitt v. Commissioner, 3 Cir., 208 F. 2d 819 [reversing 20 T.C. 352]. \* \* \*

The shares of stock in this corporation apparently became immensely more valuable in the hands of the selling stockholders. However, when they sold, they were subject to tax on whatever profit they realized thereon. During the years when this surplus was accumulated, the corporation itself was subject to income tax. Some fact must be found which justifies subjecting taxpayers to a further imposition.

The Tax Court concluded this transaction was not carried on at arm's length. But that formula is deceptive. The statute sets up no such test unless it results in an actual receipt of money or a constructive receipt of financial or economic advantage. [Footnote omitted.]

The *Holsey* case involved a situation wherein the taxpayer who was one of two equal stockholders of a corporation, obtained an option to buy the shares of the other stockholder; and he then assigned such option to the corporation which redeemed all of the other stockholder's shares—thereby causing the taxpayer to become the sole remaining stockholder. This Court held that the redemption caused the taxpayer to become chargeable with a taxable dividend; but the Court of Appeals for the Third Circuit reversed our decision—stating in part as follows:

The question presented for decision in this case is whether the Tax Court erred in holding that the payment by the Holsey Company of $80,000 to the Greenville Company for the purchase from that company of its stock in the Holsey Company was essentially equivalent to the distribution of a taxable dividend to the taxpayer, the remaining stockholder of the Holsey Company. * * *

    *     *     *     *     *     *     *

It will be observed that section 115(a) [of the 1939 Code, which is cognate to section 316 of the 1954 Code] defines a dividend as a distribution made by a corporation "to its shareholders." Accordingly unless a distribution which is sought to be taxed to a stockholder as a dividend is made to him or for his benefit it may not be regarded as either a dividend or the legal equivalent of a dividend. Here the distribution was made to the Greenville Company [the other stockholder], not to the taxpayer. This the Government, of course, concedes but urges that it was made for the benefit of the taxpayer. * * *

It is, of course, true that the taxpayer was benefited indirectly by the distribution. The value of his own stock was increased, since the redemption was for less than book value, and he became sole stockholder. But these benefits operated only to increase the value of the taxpayer's stock holdings; they could not give rise to taxable income within the meaning of the Sixteenth Amendment until the corporation makes a distribution to the taxpayer or his stock is sold. Eisner v. Macomber, 1920, 252 U.S. 189, 40 S. Ct. 189, 64 L. Ed. 521; Schmitt v. Commissioner of Internal Revenue, 3 Cir., 1954, 208 F. 2d 819 [reversing 20 T.C. 352]. In the latter case in a somewhat similar connection this court said (at page 821):

"During these years when Wolverine was buying its own shares it, of course, was subject to income tax as a corporation. Mrs. Green was subject to tax on whatever profit she made by the sale of these shares to the corporation. But what happened to warrant imposing a tax upon Schmitt and Lehren? If one owns a piece of real estate and, because of its favorable location in a city, the land becomes increasingly valuable over a period of years, the owner is not subject to income taxation upon the annual increase in value. In the same way, if a man owns shares in a corporation which gradually become more valuable through the years he is not taxed because of the increase in value even though he is richer at the end of each year than he was at the end of the year before. If he disposes of that which has increased, of course he must pay tax upon his profit. All of this is hornbook law of taxation; nobody denies it."

We think that the principle thus stated is equally applicable here. Indeed the Tax Court itself has so held in essentially similar cases. *S. K. Ames, Inc. v. Commissioner,* 1942, 46 B.T.A. 1020; *Fred F. Fischer v. Commissioner,* 1947, 6 T.C.M. 520.

On October 30, 1958, the Commissioner announced in T.I.R. 109, Internal Revenue Bulletin 1958–43, that the Internal Revenue Service will follow the Court of Appeals' decision in the *Holsey* case; and later he incorporated this announcement in Revenue Ruling 58–614, 1958–2 C.B. 920. Also the Court of Appeals' decision in the *Holsey* case was thereafter approved and followed by the Internal Revenue Service in Revenue Ruling 59–286, 1959–2 C.B. 103–105. See also *Stout v. Commissioner,* 273 F. 2d 345, 351–352 (C.A. 4), reversing on another point a Memorandum Opinion of this Court, in which the Fourth Circuit cited with approval both the Third Circuit's decision in the *Holsey* case, and also the above-mentioned announcement of the Internal Revenue Service. See also to the same effect, *Ward v. Rountree,* 193 F. Supp. 154 (M.D. Tenn.).

After examining all the above-mentioned authorities, we have concluded that the opinions of the Courts of Appeals for the Third and Ninth Circuits in the above-mentioned *Holsey* and *Niederkrome* cases are correct; and that the principles set forth in the above quotations therefrom should be followed and given effect in the present case. Cf. *John A. Decker,* 32 T.C. 326, affirmed per curiam 286 F. 2d 427 (C.A. 6).

We decide the first issue in favor of the petitioners.

## II.

As regards the second issue, the respondent has stated on brief that the decision on this will be governed by our decision on the first issue; and with this we agree. Moreover, we have hereinbefore found as a fact that the expenses of $1,608.33 which the Priester corporation incurred in connection with its purchase or redemption of Pinkerton's stock, were not incurred either at petitioner's request, or on petitioner's behalf, or for petitioner's financial benefit.

We decide this issue also in favor of the petitioners.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

TIETJENS, *J.,* dissenting: I respectfully dissent. As I view the transactions described in the findings of fact, the petitioner here was obligated to Marjorie to purchase her stock. He was financially unable to carry out this agreement and unless some other arrangement could be worked out he was faced with the prospect of losing all his

own shares in the corporation. Pinkerton stepped into the breach, but only for a short time and then only after first being assured that the corporation had the necessary funds and would use them to make him whole and provide him with a profit. When the smoke cleared away, petitioner's obligation to Marjorie had been satisfied, by use of the corporate surplus; Pinkerton was out of the picture, by pre-arrangement; and petitioner was sole owner of the corporation. Thus viewed, petitioner certainly received financial and economic benefits measured by the corporate funds used to relieve him of his obligation to Marjorie, despite the interposition of Pinkerton. The net effect was a taxable dividend to petitioner. *Wall* v. *United States*, 164 F. 2d 462; *Flanagan* v. *Helvering*, 116 F. 2d 937.

OPPER and FORRESTER, *JJ*., agree with this dissent.