DANIEL T. JACOBS, MARGARET R. JACOBS, PAUL L. SCHURGER, and ANNE C. SCHURGER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Jacobs v. Commissioner
Docket No. 5787-79.
United States Tax Court
T.C. Memo 1981-81; 1981 Tax Ct. Memo LEXIS 661; 41 T.C.M. (CCH) 951; T.C.M. (RIA) 81081; February 24, 1981. *661 Stephen M. Hester, for the petitioners. Eugene P. Bogner, for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: Respondent determined a deficiency in the income tax of petitioners Daniel T. Jacobs and Margaret R. Jacobs for 1975 of $ 469.33. He determined a deficiency in the income tax of petitioners Paul L. Schurger and Anne C. Schurger for1975 of $ 832. The sole issue presented is whether the redemption by Central Forwarding Company of 16 of its shares of common stock from one Michael Davis constituted a constructive dividend to the corporation's remaining shareholders. FINDINGS OF FACT Some of the facts in this case have been stipulated. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners Daniel T. and Margaret R. Jacobs resided in Hamilton, Ohio, when they filed their petition herein. They filed a joint Federal income tax return for 1975 with the Cincinnati ServiceCenter, Covington, Kentucky, using the cash method of accounting. Petitioners Paul L. Schurger and Anne C. Schurger also resided in Hamilton, Ohio, when they filed their petition herein. *662 They, too, filed a joint Federal income tax return for 1975 with the Cincinnati Service Center using the cash method of accounting. Future references to Jacobs, Schurger, and petitioners shall refer to the male petitioners, who were involved in the transactions to be described. On January 1, 1975, all 100 outstanding shares of the corporation, Central Forwarding Company (Central), were owned by Michael M. Davis. Early in 1975, Davis reached an oral agreement with Jacobs, Schurger, and a third party, Peter J. DePascale, Sr., [1] whereby the latter three would own all of Central's outstanding stock within a year or so. On February 8,1975, Davis sold 49 shares of Central to Jacobs, Schurger, and DePascale, who were each then issued 16-1/3 shares of Central stock. They each paid for their February,8 1975, purchase of stock from Davis with their own funds. On April 4, 1975, Jacobs, Schurger, and DePascale purchased an additional 35 shares, 11-2/3 shares for each buyer, of Central stock from Davis pursuant to a written agreement entered into on that date. Each buyer again paid for his shares *663 of stock from his own funds. Among the terms and conditions for this sale, set forth in the agreement, were that Davis would be retained as president of Central at a fixed salary plus expenses and that the corporate secretary would be retained. The agreement also provided: 4. Vendees [Jacobs, Schurger, and DePascale] or any of them shall within one (1) year from the date of the execution of this agreement purchase from the Vendor [Davis] the remaining 16 shares of common stock in the Central Forwarding Company now owned by the Vendor at the rate of $ 400.00 per share. Noadditional sales of stock were made by Davis to Jacobs, Schurger, and DePascale between April 4, 1975, and May 9, 1975. In the interval, it was mutually agreed among the parties that Central would purchase from Davis the 16 remaining shares of stock he still owned, rather than such shares being purchased by Jacobs, Schurger, and DePascale as provided in the written agreement of April 4, 1975. Davis was indifferent as to whether he received payment from the remaining shareholders or the corporation. He never released Jacobs, Schurger, and DePascale from their obligation as set forth in the original written *664 agreement, although he was willing to accept performance by the corporation. On May 9, 1975, at a special meeting of Central's shareholders, the board of directors were empowered, pursuant to authorization by all the shareholders at a meeting held on the same date, to purchase Davis' remaining 16 shares and retain it as treasury stock. The board further agreed to purchase six of the shares immediately and to enter into a contract for the remaining ten shares. No written contract was prepared regarding the agreement that the corporation would purchase the shares of stock owned by Davis. The agreement that Central would redeem the 16 shares would not have been accomplished without the final result that Davis would have disposed of his entire interest in the corporation to Jacobs, Schurger, and DePascale or someone acceptable to them. By October 1, 1975, Central had purchased all 16 shares from Davis and issued in its own name 16 new shares to be held as treasury stock. The total purchase price of $ 6,400, which was the price called for in the April 4, 1975, written agreement, was paid with corporate funds. On January 20, 1976, the 16 shares of treasury stock held by Central *665 were reissued to Jacobs, Schurger, and DePascale in certificates of 5-1/3 shares each. Centralhad earnings and profits in 1975 in excess of $ 6,400. OPINION Once again, we face the issue of whether the redemption of one shareholder by a corporation constitutes a constructive dividend to the remaining shareholders. No useful purpose would be served by an extensive discussion of the numerous cases which have dealt with this issue, because each case turns on its own facts and circumstances. Apschnikat v. United States,421 F.2d 910, 913 (6th Cir. 1970); Decker v. Commissioner,32 T.C. 326, 331 (1959), affd. per order 286 F.2d 427 (6th Cir. 1960). The basic inquiry, which has been developed to resolve this issue, is whether the continuing shareholders were primarily and unconditionally obligated to purchase the shares which were redeemed by the corporation. Sullivan v. United States,363 F.2d 724 (8thCir. 1966); Stephens v. Commissioner,60 T.C. 1004, 1011 (1973), affd. 506 F.2d 1400 (6th Cir. 1974). *666 Petitioners do not deny that they were initially primarily and unconditionally obligated by the written agreement of April 4, 1975.[2] Instead, they argue that, because they were no longer primarily liable to purchase the shares at the time of the redemption, there could be no dividend.
On the basis of the record presented herein, we are unable to find that petitioners were relieved of their primary obligation to purchase the Central stock from Davis. The fact that Davis was willing to accept payment by the corporation in their stead fails to convince us that he agreed to release them from their obligation. After the redemption, he would be out of the corporation; he was concerned only with receiving his funds, not from whence they came. He certainly did not insist upon the redemption of his shares rather than their purchase by the remaining shareholders. Cf. Lowenthal v. Commissioner,169 F.2d 694, 699 (7th Cir. 1948), affg. a Memorandum Opinion of this Court. Under these circumstances, we do not reach the legal question as to whether the conversion of petitioners' obligation *667 from a primary to a secondary status would necessarily relieve them of tax liability for having received a constructive dividend. See Sullivan v. United States,supra at 728 n. 5. Petitioners' argument, that Davis instigated the redemption in order to obtain his funds and be out of the corporate picture earlier due to his health, is unconvincing. In May 1975, Central's shareholders and board resolved to redeem Davis' remaining shares. Yet, he was not fully redeemed until October of that year. Moreover, the testimony is, at best, confusing as to whether Davis was in the hospital or unable to perform his corporate duties prior to the redemption. Petitioners have not established that Davis' health precipitated the alleged modification of the written agreement. Rule 142(a), Tax Court Rules of Practice and Procedure.
Finally, we take note of the additional fact that the redeemed shares were reissued a few months later in the names of the three shareholders who had been obligated to purchase them. While this factor standing alone might not be determinative, see Schmitt v. Commissioner,208 F.2d 819 (3d Cir. 1954), *668 revg. 20 T.C. 352 (1953), we think that, in the context of this case, it supports the conclusion that the redemption was part of the shareholders' overall plan to buy Davis' shares themselves. Cf. Adams v. Commissioner,69 T.C. 1040, 1047 (1978), affd. 594 F.2d 657 (8th Cir. 1979). Rather than the shareholder acting as the corporation's agent, see, e.g., Bennett v. Commissioner,58 T.C. 381 (1972), we think that Central acted as the agent of Jacobs, Schurger, and DePascale in purchasing the stock from Davis. Petitioners also argue that the redemption did not constitute a dividend, because they received no economic benefit from the transaction. They claim they received no economic benefit because the agreement was executory and the satisfaction of their obligation did not increase their net worth. See Decker v. Commissioner,supra.We disagree. While petitioners may not have received any enormous benefit in the form of increased wealth, [3] the purchase of the shares by the corporation removed the risk to their personal funds. Sullivan v. United States,363 F.2d at 729. To *669 ignore this benefit realized by the payment by the corporation and the concomitant withdrawal of funds from corporate solution would be to ignore the status of the corporation as a separate taxable entity. Smith v. Commissioner,70 T.C. 651, 671 (1978). Petitioners could very easily have avoided dividend treatment of this transaction had they obtained tax advice from the start. See B. *670 Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders (4th ed. 1979), pp. 9-37 to 9-43; Rev. Rul. 69-608, 1969-2 C.B. 43. Unfortunately, this is another area of the law in which "the formalities of handling a particular transaction assume a disproportionate importance and * * * a premium is placed upon consulting one's lawyer early enough in the game." Waltham Netoco Theatres, Inc. v. Commissioner,49 T.C.399, 404 (1968), affd. 401 F.2d 333 (1st Cir. 1968). Petitioners have chosen the wrong form and consequently must suffer the consequences. We leave for another day whether it is possible to carve out an exception to the now concretized standard of form over substance in the area in which the within case falls, where the impetus for substitution of the corporation the consequent modification of the arrangement the consequent modification of the arrangement is supported by independent consideration, and the corporation, as well as the seller-shareholder, had a legitimate purpose for the modification. Intertwined with the necessary analysis is the question of the extent of the applicability of United Statesv. Davis,397 U.S. 301 (1970), *671 to the circumstances giving rise to an ultimate distribution by a corporation, as contrasted with a distribution in redemption standing alone. [4]
Decision will be entered for the respondent.
Footnotes
1. The effect of the redemption on DepAscale is not currently before the Court.↩
2. Indeed, the written agreement, supra↩ at p. 4, could hardly be more explicit.
3. A redemption by the corporation of a 50-percent shareholder leaves the remaining shareholders with 100 percent of the stock worth half as much, and this is true whether the corporation is satisfying its own obligation or the obligation of the shareholder. Morever, we note that any pro-rata corporate distribution does not increase the net worth of the shareholders. It merely changes the portion remaining in corporate solution. It is the distribution out of corporate solution which is the essence of a dividend. For a thorough discussion of the so-called "economic benefit," see C. Kingson, "The Deep Structure of Taxation: Dividend Distributions," 85 Yale L.J. 861↩ (1976).
4. While there is an implication that Davis may have a broad sweep, in Smith v. Commissioner,70 T.C. 651, 669↩, n. 2, the fact is that, in that case, the Court found there was no valid corporate purpose for the redemption. See70 T.C. at 662.