Estate of Philip W. Lennen, Deceased, Thomas W. Kelly and First National City Trust Company, Executors, and Thelma A. Lennen, Surviving Wife v. Commissioner.
Estate of Lennen v. Commissioner
Docket No. 87300.
United States Tax Court
T.C. Memo 1962-285; 1962 Tax Ct. Memo LEXIS 22; 21 T.C.M. (CCH) 1507; T.C.M. (RIA) 62285; November 30, 1962
A. Chauncey Newlin, Esq., 14 Wall St., New York, N. Y., and David Sachs, Esq., for the petitioners. Dean P. Kimball, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Respondent determined a deficiency in income tax for the year ended December 31, 1952, in the amount of $112,503.20. The issues remaining for decision are: (1) Whether an amount in excess of 25 percent of the gross income stated in the return was omitted from the return so as to validate consents to extensions of time for assessment executed more than 3 but less than 5 years after the return was filed; (2), if so, whether the cancellation of indebtedness of a shareholder upon redemption of his stock by the creditor corporation was, *23 under the circumstances, essentially equivalent to a dividend within the meaning of section 115(g) of the 1939 Code; and (3), if so, whether the shareholder is entitled to increase the basis of stock sold in the same taxable year. Findings of Fact The stipulated facts are hereby found accordingly. Petitioners are Thelma A. Lennen, surviving wife of Philip W. Lennen (hereinafter called decedent), and Thomas W. Kelly and First National City Trust Company, executors of the estate of decedent. Decedent, who died on December 24, 1955, and his wife, Thelma, duly filed a joint Federal income tax return for the calendar year 1952 with the district director of internal revenue for the Upper Manhattan district of New York. On and prior to May 15, 1952, decedent was chairman of the board of directors, and Ray Vir Den was president, of Lennen & Mitchell, Inc., a New York corporation incorporated on March 27, 1916 (hereinafter called the corporation). The corporation was engaged in the advertising agency business and had its principal office in New York, New York. On and prior to May 15, 1952, the stock of the corporation was held as follows: Shares out-
Other em-
Class of stock
standing
Decedent
Vir Den
ployees
Preferred stock (nonvoting)
39,200
39,200
Class A stock (nonvoting)
6,350
3,000
1,500
1,850
Class B stock (voting)
1,000
800
200
*24 The preferred stock had a par value of $10, was entitled to cumulative dividends, beginning October 1, 1945, at the rate of 4 percent per annum prior to the payment of dividends on any other class of stock, and was entitled upon liquidation to $10 plus unpaid cumulative dividends prior to any other liquidation distributions. It was nonparticipating stock and was not entitled to vote except after two years' default in the payment of dividends. The class B stock had a par value of $1, was entitled to noncumulative dividends of $1 per share prior to the payment of dividends on class A stock, and was entitled upon liquidation to $1 per share. It was nonparticipating stock and was the only voting stock outstanding. The class A stock had a par value of $1 and was entitled to dividends and liquidation distributions subject to the preferences of the preferred stock and the class B stock. It was not entitled to vote. On November 30, 1945, a "Class A Stock Option Agreement" was entered into by the holders of class A stock of the corporation, including, among others, decedent and Vir Den. This agreement provided, in part, as follows: 1. In the event of his death or the termination of *25 his employment by [the corporation] for any other reason whatsoever, each Stockholder hereby grants to each of the other persons then holding shares of the Class A Stock of record, according to the books of [the corporation] * * *, a prior and preferential right to purchase a proportionate part of the shares of such Stock at the time held by him. * * * 2. * * * In the event that none of the Remaining Stockholders shall give such written notice within the thirty-day period referred to above, or if all of such Remaining Stockholders shall deliver to such person or his personal representative, if one has been appointed, their consent in writing thereto, the said person or his personal representative shall first offer the shares of the Stock held by him to [the corporation], in writing, at a price equal to the book value thereof to be determined as hereinafter provided and [the corporation] shall have the right to purchase all or any part of said shares at such price, during a period of five days after receipt of such offer. Decedent wrote a letter to Vir Den, dated June 1, 1951, as follows: For a long time I have made known to you my desire that you shall be in a position *26 to acquire sole control and principal ownership of [the corporation] in the event of my death. * * *
In the event of my death I agree that you shall have the first option to purchase from my executors and trustees my 800 shares of voting control stock at $1. per share provided: a. That the Class A stockholders or the corporation itself shall purchase from my estate for cash, under the terms of the Class A stock option agreement in force at the time of my death, my entire holdings of 3,000 shares of Class A stock; and b. That simultaneously the corporation shall purchase from my estate for cash my entire holdings of [the corporation's] 4% preferred stock at its full par value price of $10 per share, or a total of $392,000 for the 39,200 shares of this stock plus any accrued or unpaid dividends on this stock. * * *
Upon your death or retirement, I shall, of course exercise my right and option, which you are now granting to me hereunder, to purchase all your shares of the Class B stock at a price equal to the $1 par value thereof. This option on your Class B stock shall be personal to me and shall not be assignable * * *. Kindly confirm that all the foregoing is *27 in accordance with our understanding and constitutes an agreement between us, by signing the enclosed copy of this letter and returning it to me. * * * ACCEPTED: /s/ Ray Vir Den Early in 1952, decedent had many conferences with H. W. Newell (hereinafter called Newell), a senior executive and minority stockholder of another advertising agency in New York City, Geyer, Newell & Ganger, Inc., as to the possibility of merging the two agencies. Decedent had not been in good health. He had suffered several heart attacks and he was no longer physically able to direct a large advertising agency such as the corporation. Bertram B. Geyer, the chief executive and majority stockholder of Geyer, Newell & Ganger, Inc., prevented such a merger. Negotiations between decedent and Newell continued. Newell made it clear that he did not want Vir Den's minority voting stock interest to continue and that he would not go into any transaction if Vir Den continued as a minority voting stockholder. However, Newell did not approach Vir Den because the two were not on friendly terms. Decedent assured Newell that he, decedent, would have no problem in dealing with Vir Den. Decedent and Newell entered into *28 an agreement on May 15, 1952, which provided in part as follows: This is to record the agreement between us regarding [Newell's] employment by [the corporation] and the subsequent creation by [Newell] of a new corporation to carry on its business. 1. Beginning June 1, 1952, [Newell] shall be employed by [the corporation] as president and chief executive officer. * * *
2. [Newell] shall have the option to purchase for cash at any time prior to December 1, 1952, [decedent's] 39,200 shares of preferred stock, 3,000 shares of class A stock, and 800 shares of class B stock, of [the corporation], at a price equal to book value as of June 1, 1952 for the preferred stock and class A stock, and book value as of June 1, 1952 plus $200,000 for the class B stock. * * * 3. [Decedent] [undertakes] and [agrees] promptly to acquire the 200 shares of class B stock of [the corporation] now owned by Ray Vir Den, and [Newell] shall have the option to purchase that stock from [decedent] at any time prior to December 1, 1952, for cash, at a price of book value as of June 1, 1952 plus $50,000. * * * [Newell] may assign the options provided for in Articles 2 and *29 3 to the corporation to be formed, referred to below, for exercise by it. 4. [Newell] [undertakes] to cause to be incorporated under the laws of the State of New York a new corporation to be called Lennen & Newell, Inc. It shall be authorized to issue 1,000 shares of $100 par value 5% preferred stock, which shall have the sole voting power, and 200,000 shares $1 par value common stock, which shall be the equity participation stock. [Newell] shall purchase for cash at par all of the preferred stock, and shall have the right to purchase at par for cash for [his] own account not more than 30,000 shares of the common stock. [Decedent] shall be afforded the opportunity to purchase at par for cash 10,000 shares of the common stock. Such of the present minority stockholders of [the corporation] as [decedent and Newell] shall determine shall be afforded the opportunity to purchase for cash at par shares of common stock in such amounts as [decedent and Newell] shall agree. It is also understood that, as agreed between [decedent and Newell], shares of common stock will be made available for purchase by others to be employed by the new corporation. [Decedent and Newell] *30 expect that not more than 100,000 shares of the common stock will be issued incident to the organization of the new corporation. * * *
5. In the event the option to purchase [decedent's] stock provided for in paragraph 2 is exercised, [decedent] will become chairman of the board of Lennen & Newell, Inc., and it will enter into a five-year employment contract with [decedent] * * *. * * *
6. In the event the option to purchase [decedent's] stock provided for in paragraph 2 is exercised, [decedent] [agrees] to loan to [Newell] $250,000 for a period of five years, with interest at 6% per annum. [Newell's] note to [decedent] for this loan shall also be the obligation of Mrs. Newell and shall be collateralized by a like principal amount of debentures of Lennen & Newell, Inc. [Newell] [agrees] to use the proceeds of [decedent's] loan to [Newell] to subscribe for debentures in that corporation. At the time this agreement was made, it was contemplated by decedent that he would withdraw practically all of his capital but would lend $250,000 to Newell, who would put the money back in the business. Newell's wife, who had an independent estate, was also *31 to be obligated on decedent's loan. In this way, decedent undertook to provide capital for the business without being subject to the hazards of the enterprise by securing himself through the personal obligation of the Newells. It was also contemplated that the business of the corporation would be carried on by a new corporation, to be called Lennen & Newell, Inc. Such corporation was incorporated under the laws of New York in May 1952. The original plan later was changed and the business was continued under the charter of the corporation, with a recapitalization and a change of name. Some transactions were in the name of the newly organized corporation, Lennen & Newell, Inc., but that corporation never did any business. It was dissolved in October 1952 and all of its commitments were taken over by the corporation, the name of which was changed to Lennen & Newell, Inc. On May 16, 1952, decedent accepted Vir Den's resignation as president of the corporation and on May 20, 1952, announcements were made in the public press of the reorganization of the corporation's business. On June 1, 1952, Newell took over as the chief executive officer of the corporation. He brought in 23 top *32 executives and many additional personnel from Geyer, Newell & Ganger, Inc., and a number of executives, including Adolph J. Toigo, from other advertising agencies. Around 50 to 60 persons were newly employed by the corporation and a number of accounts were transferred to it. The agency, as reorganized, began business on June 1, 1952. From that time until his death on December 19, 1954, Newell was its chief executive officer. On or about June 19, 1952, summonses and complaints were served in two actions in the Supreme Court of the State of New York, County of New York. In both actions Ray Vir Den was the plaintiff. In one action decedent was named defendant, and in the other, Robert M. Ganger, Newell, and the corporation were named defendants. The gist of the complaints was that Vir Den, by virtue of the contract with decedent dated June 1, 1951, had the option, upon the death of decedent, to acquire the latter's 800 shares of class B voting stock in the corporation upon the terms and conditions set forth in that contract. In the action against Ganger, Newell, and the corporation, it was alleged that, in violation of the contract, the defendants were causing a second corporation to *33 be formed to acquire the business and good will of the corporation and were causing decedent to dispose of his class B stock, both alleged to be in violation of Vir Den's rights under his contract and to his detriment, and it was claimed that by reason thereof Vir Den had been damaged in the sum of $1,000,000. In the complaint against decedent, similar allegations were made and it was alleged that the sale by decedent of his class B stock was in violation of his agreement with Vir Den and in deprivation of the latter's rights to acquire the class B voting stock upon the death of decedent. It was claimed that, by reason of this, plaintiff had been damaged in the sum of $1,000,000. The complaints were never filed in court. This was the first time Newell had heard of the agreement of June 1, 1951. Negotiations with counsel for Vir Den were undertaken by counsel for Newell. Decedent considered it to be Newell's problem, since Newell had come to be in control of the business and the matter was primarily in his interest. Newell believed it essential to settle the case, regardless of the validity of Vir Den's claims, because it would have created bad publicity for the newly reorganized *34 agency to be involved in litigation of this nature. After extended negotiations, a settlement was reached under which Vir Den was to be paid $250,000 for all of his stock of the corporation. On July 17, 1952, decedent wrote to Newell with regard to settlement, in part, as follows: The book value of Vir Den's stock as of April 30, 1952 is $82.48 per share. On 1500 shares the purchase price of this stock by the company will be $123,720. On the proposed total package price of $250,000 for both his Class A stock and his 200 shares of Class B stock Ray will receive a check from me for $126,280. This is $76,280 more than we contemplated for the purchase of his 200 shares of Class B stock. I have given every consideration to Mr. Newlin's suggestion that I purchase $450,000 face value of L & N debentures for $300,000 cash. * * *
As you know, the vital and cardinal incentive to me in entertaining the proposal to sell out my interest in Lennen & Mitchell was to get all of my capital out for the protection of my family and my estate. * * *
The agreement entered into with you on May 15 facilitated the realization of this desire. I was to get out all of the book value of my *35 3000 shares of Class A stock as of June 1, 1952. My preferred stock of $392,000 also was to liquidate itself. Your only cash investment was to be $200,000 for my 800 shares of Class B stock plus $50,000 to be paid to Ray Vir Den for his 200 shares of this stock. * * *
Due to the extremely severe proposed settlement with Vir Den… a settlement entertained for the protection of our client interest, it now appears that instead of paying $50,000 to Vir Den for his Class B stock, the proposed deal requires a payment to him of $126,280… or a payment of $76,280 in excess of the price originally contemplated. * * *
What this means in the net to you is this, that instead of paying Vir Den $50,000 for his Class B stock, you are to pay $126,280. Plus the $200,000 you are to pay me for my Class B stock it will make the total cost of the Class B stock to you $326,280.00. When you volunteered that you would accept this unexpected penalty for Vir Den's stock I agreed that I would increase the amount of my loan to you by that same amount. This would mean, Hike, that instead of loaning you $250,000 as outlined in our original agreement, my loan to you would increase to $326,280.00. *36 * * * [You] issue me two notes, one as originally planned for $250,000 to be signed by you and endorsed by Mrs. Newell; and, the second note for $76,280.00 to be signed by you alone, both notes to be collateralized by debentures. * * * I would be very unhappy about investing $300,000 in debentures * * *. [The] principle of the thing is that I am back as a heavy investor in the agency business again… which at 65 years of age and my more or less erratic health record, is going completely contrary to the best advices of my friends and to my own inner desires. On July 24, 1952, the corporation advanced $126,280 to decedent. The advance was recorded on the corporation's books as follows: Notes Receivable,
P. W. Lennen
$126,280
Cash
$126,280
The settlement agreement, dated July 29, 1952, was made between decedent and Vir Den, although it had been negotiated by Newell's counsel and was approved by Newell. This agreement provided, in part, as follows: 1. In accordance with its contract with [Vir Den], dated November 30, 1945, [the corporation] will purchase [Vir Den's] 1,500 shares of its Class A stock for $123,720, such amount being the book *37 value of the stock as of April 30, 1952. 2. [Decedent] will purchase [Vir Den's] 200 shares of Class B stock of [the corporation] for $126,280, whereupon the option agreement between [decedent and Vir Den], dated June 1, 1951, relating to the Class B stock of [the corporation] shall have no further force or effect. On July 17, 1952, the class A stockholders waived their right to purchase Vir Den's class A stock. On July 29, 1952, the corporation acquired Vir Den's class A stock for $123,720, decedent acquired Vir Den's class B stock in exchange for his personal check for $126,280, the May 15, 1952 agreement between decedent and Newell was amended to increase from $50,000 to $126,280 the option price for the class B stock acquired from Vir Den and to increase from $250,000 to $325,000 the amount which decedent would lend to Newell, and Vir Den executed a general release in favor of decedent, Newell, the corporation, and others. On September 9, 1952, the May 15, 1952 agreement between decedent and Newell, as amended on July 29, 1952, was superseded by a new agreement, which provided, in part, as follows: 1. [Decedent] [agrees] to sell to [Newell], and [Newell] *38 [agrees] to purchase from [decedent] on this date, for $200,000, 800 shares of Class B stock of [the corporation] held by [decedent]. 2. Pursuant to agreement dated July 29, 1952, 200 shares of Class B stock of [the corporation] were purchased from Ray Vir Den for $126,280. [Decedent and Newell] agree on the assumption of payment for this stock by [the corporation] and that the stock belongs to it. 3. [Decedent and Newell] agree to cause the certificate of incorporation of [the corporation] to be further amended so that its authori0ed capitalization will consist of: (a) 39,200 shares of preferred stock, having all the terms of such class of stock now outstanding. (b) 6,350 shares of non-voting Class A stock, which shall be entitled to $88 per share in the event of liquidation before any distribution shall be made on the Class C stock referred to below, and which shall be entitled to dividends at the annual rate of $4 per share, cumulative to the extent earned, after payment of dividends on the preferred stock and the Class B stock but before any other dividends are paid. (c) 800 shares of Class B stock, having all the terms of such class of stock now outstanding. *39 (d) 200,000 shares of non-voting Class C stock, $1 par value per share. It shall be further provided that, after paying or making provision for paying dividends on the preferred stock, the Class A stock (as above), and the Class B stock (in accordance with its terms), all earnings shall be divided among the Class A stock and the Class C stock on a per share (and not a per class) basis. * * *
4. All of the preferred stock and all of the Class A stock now outstanding shall continue outstanding in the hands of the present holders, except the Class A stock shall be converted into Class A stock with terms and provisions as set forth above. 5. The corporation will issue and sell for cash, at par, up to 93,650 shares of the new Class C stock, so that when this agreement has been fully carried out, there will come to be outstanding a maximum total issue of Class A stock and Class C stock combined not in excess of 100,000 shares. [Newell] shall have the right to purchase from the corporation for [his] own account not more than 30,000 shares of Class C stock, and [decedent] shall have the right to purchase from the corporation 7,000 shares of such stock. Such of the present *40 minority Class A stockholders of [the corporation] as [decedent and Newell] may determine shall be afforded the opportunity to purchase Class C stock in such amounts as [decedent and Newell] shall agree. It is also understood that shares of Class C stock will be made available for purchase by other employees of [the corporation] as [decedent] may determine. 6. [Decedent and Newell] shall cause the name of [the corporation] to be changed to Lennen & Newell, Inc. * * * [Newell] shall dissolve the corporation named Lennen & Newell, Inc. which [he] recently incorporated. * * *
9. In case of [decedent's] death, disability, or termination of employment * * * while [Newell is] alive, [Newell] [agrees] to purchase, or cause to be purchased, from [decedent] or [his] estate, within ninety days after the happening of any such event all of [decedent's] stock in Lennen & Newell, Inc. at the following prices: (a) Preferred stock at par value plus accrued unpaid dividends as of the date of purchase. (b) Class A stock at $88 per share, plus accrued unpaid dividends, and plus its share of earnings accumulated from June 1, 1952 to the end of the months next *41 preceding the date of [decedent's] death, disability or termination of employment. (c) Class C stock at the book value as of the last day of the month next preceding the date of [decedent's] death, disability or termination of employment. 10. In case of [Newell's] death, disability or termination of employment * * * while [decedent is] alive and owning any of the securities of that corporation, Adolph Toigo, if he is then in the employ of the corporation shall have the following respective rights with respect to the 800 shares of Class B voting stock to be sold by [decedent] to [Newell] hereunder: (a) For a period of six months after such event [decedent] shall have the right to purchase from [Newell] or [Newell's] personal representative, at the price of $100,000, 400 shares of such stock, and Adolph Toigo shall have the right, for a like period, to purchase from [Newell] or [Newell's] personal representative, at the price of $100,000, the balance of 400 shares of such stock. (b) At any time during such six months period Adolph Toigo shall have the right to purchase, or cause to be purchased, from [decedent] all the securities of Lennen & Newell, Inc. *42 held by [decedent], at the following prices: (1) Preferred stock at par plus accrued unpaid dividends as of the date of purchase. (2) Class A stock at $88 per share, plus accrued unpaid dividends, and plus its share of earnings accumulated from June 1, 1952 to the end of the month next preceding the date of [Newell's] death, disability or termination of employment. (3) Class B stock at [decedent's] cost. (4) Class C stock at the book value as of the last day of the month next preceding the date of [Newell's] death, disability or termination of employment. (c) If all of [decedent's] securities are not so purchased, for a period of 90 days after the expiration of said six months period [decedent] shall have the right to purchase from the then holder or holders the 400 shares of Class B stock which Adolph Toigo has the prior right to purchase as aforesaid, at a price of $100,000. * * *
13. In view of his importance to the corporation and the fact that under this agreement he may come to be its controlling stockholder, a capital investment in the business by Adolph J. Toigo is considered by [decedent and Newell] to be reasonable and desirable. The corporation *43 now holds in its treasury 1,500 shares of Class A stock, purchased from Ray Vir Den under [decedent's] agreement with him dated July 29, 1952 for $123,720, or at the rate of $82.48 per share. Mr. Toigo agrees to purchase, from the corporation on or before October 1, 1952, 1,250 of such shares at $82.48 per share, and until that date he shall have the option to purchase from it the balance of 250 shares at the same price, and [decedent and Newell] agree to cause the corporation to sell such stock to him on that basis. Such shares of Class A stock as initially issued to Mr. Toigo shall have the terms of the present stock and not the new terms but shall be exchangeable for shares having the new terms herein provided. The previously existing provisions for a loan by decedent to Newell were not included in this agreement. On September 9, 1952, decedent transferred his 800 shares of class B stock to Newell for $200,000. On the same day, Newell wrote to the treasurer of the corporation as follows: Pursuant to agreement dated July 29, 1952, 200 shares of Class B Stock of [the corporation] were purchased from Ray Vir Den for $126,280. I understand that the corporation furnished *44 the cash for this purchase, and the amount was temporarily charged on its books to [decedent]. The purchase of this stock was for the account of [the corporation] and you are instructed to cancel on its books the amount which you have charged to [decedent], and the transaction should be recorded on the books as a purchase by the corporation of 200 shares of its Class B stock for cancellation at a price of $126,280. On the same day, decedent deposited for cancellation the 200 shares of class B stock acquired from Vir Den, and the corporation made the following entry: Debit - Class B Stock, Vot-
ing
$ 200.00
Debit - Earned Surplus
$43,764.35
Debit - Paid In Surplus
$82,315.65
Credit - Notes receivable
P. W. Lennen
$126,280
In October 1952 the certificate of incorporation of the corporation was amended, changing its name to Lennen & Newell, Inc., and changing its authorized capitalization to 39,200 shares preferred stock, $10 par value, 6,350 shares nonvoting class A stock, without par value, 800 shares voting class B stock, $1 par value, 200,000 shares nonvoting class C stock, $1 par value. Pursuant to the agreement of September 9, 1952, at *45 various times prior to December 31, 1952, Newell purchased from decedent for $200,000 the outstanding 800 shares of class B stock of the corporation and purchased for cash from the corporation 30,000 shares of the new class C stock at $1 per share, Adolph J. Toigo purchased from the corporation for cash at $82.48 per share 1,500 shares of new class A stock, other employees of Lennen & Newell, Inc., exchanged share-for-share 1,850 shares of old class A stock for 1,850 shares of new class A stock, and the corporation sold to employees (principally new executives whom Newel had brought into the business) 47,100 additional shares of new class C stock for cash at $1 per share. Otherwise, no stock was issued by the corporation prior to the end of 1952. Throughout 1952 and for some time thereafter, decedent continued to hold all of the 39,200 shares of outstanding preferred stock of the corporation. In October 1952, the new class A stock of the corporation was exchanged, share-for-share, for the old class A stock and decedent acquired on the exchange 3,000 shares of new class A stock in exchange for the 3,000 shares of old class A stock which he had held. On November 7, 1952, decedent purchased *46 for cash from the corporation 7,000 shares of the new class C stock at $1 per share. He never thereafter acquired any additional stock. After the foregoing transactions, the stock ownership of the corporation was as follows: Shares out-
Other em-
Class of stock
standing
Decedent
Newell
ployees
Preferred stock (nonvoting)
39,200
39,200
Class A stock (nonvoting)
6,350
3,000
3,350
Class B stock (voting)
800
800
Class C stock (nonvoting)
84,100
7,000
30,000
47,100
Dividends paid by the corporation from 1942 through 1952 were as follows: Year
Dividends paid
1942
1943
1944
1945
1946
$ 17,120
1947
119,380
1948
135,080
1949
141,060
1950
144,680
1951
150,030
1952
16,480
In 1954, decedent completely terminated his stock interest in the corporation by selling his preferred shares to the corporation and his class C common shares to employees of the corporation. He remained as a consultant but no longer had any proprietary interest in Lennen & Newell, Inc. In his Federal income tax return for 1952, decedent reported a long-term capital gain of $199,200 from the sale to Newell of decedent's 800 shares *47 of class B stock (gross sales price of $200,000 less cost of $800) and total gross income of $396,482.69. He did not report any income from the transactions involving the 200 shares of class B stock acquired from Ray Vir Den. In a deficiency notice sent after 3 years but within a period of 5 years, as extended by waivers, after the return for 1952 was filed, respondent determined that under the provisions of section 115(g) of the Internal Revenue Code of 1939 the cancellation of your indebtedness and stock by Lennen & Mitchell, Inc. was executed at such time and in such manner as to constitute a distribution essentially equivalent to a taxable dividend to you in the amount of $126,280.00 for the taxable year ended December 31, 1952. Opinion Out of the complicated and sometimes obscure arrangements and rearrangements leading to the corporation's recapitalization, certain facts appear with reasonable clarity. One is that before decedent made any payment for the elimination of Vir Den's interest in the corporation, and before he procured the necessary cash by giving the corporation his note in the amount to be paid, he had Newell's agreement that the $76,280 payable to Vir Den *48 over and above the original option price was to be repaid to decedent. At least respondent, upon whom the burden rests to show that the 5-year statute applies, C. A. Reis, 1 T.C. 9 (1942), affd. 142 F. 2d 900 (C.A. 6, 1944), has not shown that the parties' arrangement was otherwise. While the detail was eventually changed to a minor extent so that the repayment was made to decedent by the corporation's cancellation of his debt upon Newell's acquisition of voting as well as actual control, we think it clear that at least that amount could not have been chargeable to him as income and that this part of the transaction from the beginning had to be the kind of "washout" [1] to which section 275(c) was not intended to apply. Abbott L. Johnson, 32 T.C. 257 (1959), affd. 276 F. 2d 110 (C.A. 7, 1960); Emma B. Maloy, 45 B.T.A. 1104 (1941). See also Colony, Inc. v. Commissioner, 357 U.S. 28 (1958). When that amount is eliminated, even if we assume that the balance of the redemption payment was for decedent's benefit, in paying the purchase price of the Vir Den stock, [2] and hence could have constituted a distribution *49 to him, the amount was far short of the 25 percent of gross income necessary to bring the 5-year statute into play. [3]
*50 Without more, we accordingly conclude that the deficiency notice was not timely and that the determination cannot be sustained. It may well be, of course, that this was but the first step in an integrated plan to eliminate decedent entirely as a shareholder in the corporation, Carter Tiffany 16 T.C. 1443 (1951); Jackson Howell, 26 T.C. 846 (1956), affirmed sub nom. Phelps v. Commissioner, 247 F. 2d 156 (C.A. 9, 1957); or at least that decedent derived no "true economic benefit from the transactions when considered as a whole" and was no more than a conduit or go-between in the entire transaction. John A. Decker, 32 T.C. 326, 332 (1959), affd. 286 F. 2d 427 (C.A. 6, 1960); Fox v. Harrison, 145 F. 2d 521 (C.A. 7, 1944). See also Milton F. Priester, 38 T.C. 316 (1962), on appeal (C.A. 6, Oct. 12, 1962). But these are questions which we do not reach in the view we have taken on the issue relating to the statute of limitations. Decision will be entered for the petitioners. Footnotes
1. "Following the principles underlying the Maloy decision, we need not decide whether the reimbursement of expenses, to the extent that it resulted in an economic washout, is generically gross income under section 22(a). The point is that respondent has failed to establish that petitioner was required to report that amount on his return as gross income." Abbott L. Johnson, 32 T.C. 257, 261 (1959), affd. 276 F. 2d 110↩ (C.A. 7, 1960). 2. This appears to be essentially respondent's own position. He states in his reply brief: "At the outset respondent acknowledges that an adjustment must be made with respect to the tax basis for the 800 shares of Class B stock sold by [decedent] to Newell * * * "While respondent concedes that an adjustment should be made * * * he contends that it should not be the $126,280 paid in redemption of the 200 shares because that price was obviously artificial and in excess of the true value of that stock. The true value of that stock was * * * $50,200. * * * The excess amount paid over and above this cannot be considered to represent an addition to cost. On the contrary it represents other considerations including, so far as this record shows, [decedent's] release from liability in the Vir Den suit against him." ↩
3. Twenty-five percent of $396,482.69, the total gross income reported on decedent's return for 1952, would be $99,120.67.↩